COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judge Annunziata and Senior Judge Willis
Argued at Alexandria, Virginia


KEVIN CHRISTOPHER KELLY
                                                            OPINION BY
v.        Record No. 0762-03-4                      JUDGE JERE M. H. WILLIS, JR.
                                                          FEBRUARY 3, 2004
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                            Rossie D. Alston, Jr., Judge

            Edwin Vieira, Jr., for appellant.

            Robert H. Anderson, III, Senior Assistant Attorney General
            (Jerry W. Kilgore, Attorney General, on brief), for appellee.


        Kevin Christopher Kelly was convicted in a jury trial of involuntary manslaughter and

felony child neglect in connection with the death of his twenty-one-month-old daughter, Frances.

On appeal, he contends that the evidence is insufficient to support his convictions.  We affirm the

judgment of the trial court.

                                        BACKGROUND

        "On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Archer v. Commonwealth,

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted).

        On May 29, 2002, at approximately 7:00 p.m., neighbors found Frances strapped in a car

seat inside a locked van parked outside Kelly's house.  The windows were closed.  That day had

been very hot.  Emergency workers who arrived at the scene determined Frances had died.  Two

hours later, her body temperature was 105.7 degrees.  The medical examiner testified Frances

died from hyperthermia caused by her being left inside the hot vehicle.

Kelly told investigating police officers that his wife and eldest daughter were visiting family in Ireland, leaving him in charge of the family's twelve other children. He gave the police a written statement detailing his actions on that day. His statement reveals that although he was in and out of the home throughout the day, he had not checked on Frances' welfare for a period of at least seven hours.

Around noon, Kelly took Frances and his other "preschool children," "to pick up the high school/junior high kids from" school. One of the children needed to stay late at school. He returned home with the others. He told one officer that he instructed his "older kids" to get everyone in the house. He told another officer that he told Anthony, his sixteen-year-old son, "to take the children inside." He did not see that this was done. Leaving the van parked in the street, he left in another vehicle to pick up the child from school.

Kelly returned to the house at 1:00 p.m. He left again at 2:30 p.m. to pick up his "grade school kids." He returned home at approximately 4:00 p.m., at which time he spoke with Michael Byrne, a heating and air conditioning mechanic working at a neighboring house. Kelly told the police that during this time, he assumed Frances was taking a nap, that she normally took a nap in the early afternoon.

Byrne testified that over the next two to three hours, he saw Kelly "in and out of the house several different times." During this time, Kelly and Anthony worked on a fence. The van remained parked on the street. Between 5:00 p.m. and 6:00 p.m. Byrne saw Kelly enter his other vehicle and shortly thereafter noticed the vehicle was no longer in the driveway. Byrne testified that Kelly would "either [have driven] by [the van] or he could have backed up next to it when he backed out" of the driveway in the other vehicle.

At approximately 7:00 p.m., Joan and Brian McIvor discovered Frances in the van. Brian McIvor went to the house and told Anthony that there was a child in the van. Anthony "looked

very panicked" and ran to the van.  He retrieved the keys to the vehicle and opened the door.

Joan McIvor screamed for help, and Byrne called 911 from his cellular telephone.  Byrne

unsuccessfully attempted to resuscitate the child.  He noticed she was very hot to the touch and

that her skin was peeling.  The rescue squad arrived and determined Frances had died.  One of

Kelly's sons called him, and he returned home shortly after the paramedics arrived.

Dr. Robin Foster testified as an expert in pediatrics, pediatric emergency medicine, and

child abuse and neglect.  He explained that a twenty-one-month-old child, "because of [her]

mobility, require[s] constant supervision."  He testified that during a seven-hour waking period,

such a child would need two meals and at least twelve ounces of fluid.  He further explained that

during a seven-hour period, such a child would also require several diaper changes and a daytime

nap.  Because of the heat on May 29, 2002, a twenty-one-month-old child would have required

additional fluid to remain hydrated.

Erin and Amber Beacher lived across the street from Kelly and his family.  They

testified, without objection, about prior incidents involving Kelly's children.  Both girls had seen

children locked inside a car or the van in front of Kelly's residence on hot or warm days.  Erin

explained that on two occasions, approximately three and four years prior to the current incident,

she alerted Kelly that a child had been left in a vehicle.  Both times "a slight crying from the

van" had attracted her attention.  Amber reported a similar incident, two or three years earlier, in

which she and a friend found a crying two to three-year-old child locked in the van on a warm

summer day.  Amber's companion knocked on the Kellys' door and spoke to Kelly.

ANALYSIS

I.

In his sufficiency challenge, Kelly also argues that "the verdicts contravene the Due Process Clauses of the Constitutions of Virginia and of the United States," that the testimony of the Beacher sisters was irrelevant, and that the evidence failed to exclude reasonable hypotheses of innocence. We need not address these issues.

## Constitutional Arguments

This Court will not consider an argument on appeal that was not presented to the trial court. Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998); Rule 5A:18. The requirements of Rule 5A:18 apply equally to constitutional claims. Deal v. Commonwealth, 15 Va. App. 157, 161, 421 S.E.2d 897, 900 (1992). Kelly raised no constitutional arguments in his motion to strike the evidence. Accordingly, Rule 5A:18 bars our consideration of this question on appeal. The record reflects no reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

## Relevancy Argument

Rule 5A:18 requires that objections to a trial court's action or ruling be made with specificity in order to preserve an issue for appeal. Campbell v. Commonwealth, 12 Va. App. 476, 480, 405 S.E.2d 1, 2 (1991) (*en banc*). A trial court must be alerted to the precise "issue" to which a party objects. Neal v. Commonwealth, 15 Va. App. 416, 422-23, 425 S.E.2d 521, 525 (1992). Kelly did not challenge the testimony of the Beacher sisters either at the time they testified or in his motion to strike the evidence. Therefore, Rule 5A:18 bars our consideration of this question on appeal.

<u>Hypotheses of Innocence Argument</u>

Kelly contends that his convictions must be reversed because the Commonwealth failed to exclude all reasonable hypotheses of his innocence. This principle applies only when the Commonwealth attempts to prove its case through circumstantial evidence. <u>See</u>, <u>e.g.</u>, <u>Burrows v. Commonwealth</u>, 224 Va. 317, 319, 295 S.E.2d 893, 894 (1982) (evidence insufficient to prove accused was criminal agent in robbery and malicious wounding because victim could not affirmatively identify his assailant and circumstantial evidence did not exclude all reasonable hypotheses of appellant's innocence). When the Commonwealth offers direct evidence from eyewitnesses whose testimony is not inherently incredible, the jury may accept that testimony as credible and reject all conflicting evidence, thereby determining, in essence, that no reasonable hypotheses of innocence remain.

## II.

Kelly contends that the Commonwealth failed to demonstrate that he acted with "criminal negligence" and, therefore, failed to prove the elements of the involuntary manslaughter and child neglect charges.

<u>The Charges</u>

Involuntary manslaughter is defined "as the accidental killing of a person, contrary to the intention of the parties, during the prosecution of an unlawful, but not felonious, act, or during the improper performance of some lawful act." <u>Gooden v. Commonwealth</u>, 226 Va. 565, 571, 311 S.E.2d 780, 784 (1984). To convict Kelly of involuntary manslaughter, the Commonwealth had to prove beyond a reasonable doubt that Kelly committed

> acts of commission or omission of a wanton or willful nature,
> showing a reckless or indifferent disregard of the rights of others,
> under circumstances reasonably calculated to produce injury, or
> which make it not improbable that injury will be occasioned, and

the offender knows, or is charged with the knowledge of, the probable results of his acts.

Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938).

Similarly, Code § 18.2-371.1(B)(1) provides:

Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

Both charges require proof that Kelly engaged in gross, wanton and culpable conduct which demonstrated a reckless disregard for human life. "Such conduct 'has come to be known as "criminal negligence."'" Cottee v. Commonwealth, 31 Va. App. 398, 400, 524 S.E.2d 132, 133 (2000) (citation omitted).

### Criminal Negligence

Criminal negligence "must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life." Bell, 170 Va. at 611, 195 S.E. at 681.

Criminal negligence . . . is judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts. See Keech [v. Commonwealth], 9 Va. App. [272,] 279, 386 S.E.2d [813,] 817 [(1989)] (citing Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938)). Thus, criminal negligence "'is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct *probably* would cause injury to another.'" Tubman [v. Commonwealth], 3 Va. App. [267,] 271, 348 S.E.2d [871,] 873 [(1986)](emphasis added) (quoting Griffin [v. Shively], 227 Va. [317,] 321, 315 S.E.2d [210,] 213 [(1984)]; Friedman v. Jordan, 166 Va. 65, 68, 184 S.E. 186, 187 (1936)).

Conrad v. Commonwealth, 31 Va. App. 113, 121-22, 521 S.E.2d 321, 325-26 (1999) (*en banc*).

Kelly was solely responsible for Frances, a twenty-one-month-old child. He strapped her into her car seat in the family van, thus placing her in a position in which she was rendered helpless. This position became lethal when Kelly, through his dereliction, left Frances in the vehicle and only quickly and casually instructed other children or a sixteen-year-old boy to get all the children out of the van and into the house. Kelly departed immediately without ensuring that his instructions were obeyed. Specifically, he abandoned Frances without ensuring that she was removed from her confinement in the car sear and lodged safely in the house. Thereafter, over the course of several hours, he made no further provisions for or inquiry about Frances. He busied himself with family matters and household repairs, at times within sight of the van in which Frances was trapped. During a period of over seven hours, Kelly assumed but never ascertained that Frances was asleep in the house. During that period, he made no provision for her care, nourishment, or safety. Expert testimony established that a child of Frances' age would require food, drink, sleep, and diaper changes over the course of a seven-hour period. Kelly made no effort to provide these necessities. He utterly ignored Frances.

The Beacher sisters explained that they had informed Kelly on at least three previous occasions that one of his children was locked in a vehicle. Thus, Kelly was on notice of this hazard. Nevertheless, Kelly failed to oversee Frances and, in complete dereliction of his duty to her, he failed to investigate her whereabouts or well-being for an unreasonably long period of time.

The medical examiner testified that Frances could have survived only one and a half or two hours in the closed van. Kelly argues that only his omissions in that time frame are relevant to the charges against him. We disagree. His failure to inquire after Frances from the time he left her in the van to her discovery by the McIvors bespeak his total and utter disregard for her well-being, safety, and life.

- 7 -

Accordingly, the record supports the jury's conclusion that Kelly knowingly engaged in conduct "so gross, wanton, and culpable as to show a reckless disregard of human life" which proximately caused Frances' death.  We, therefore, affirm the convictions.

<u>Affirmed.</u>